# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID WEIDERT, | 1:06-CV-00459 LJO SMS HC |
|         Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES YATES, Warden, et al., | |
|         Respondents. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this Court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

## BACKGROUND[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on October 20, 1981, of murder in the first degree in violation of Cal. Penal Code § 187, and kidnaping in violation of Cal. Penal Code § 207. See Exhibit 1, Respondent's Answer to Petition (hereinafter "Answer"). Petitioner was initially sentenced to life imprisonment without the possibility of parole. See Exhibit 3, Answer. However, the California Court of Appeals, Fifth

---

[1] This information is derived from exhibits lodged with Respondent's answer.

1

Appellate District, partially granted Petitioner's appeal and remanded the case for re-sentencing. Id. Pursuant to the appellate court's order, the sentencing court re-sentenced Petitioner on February 11, 1986, to twenty-five years to life with the possibility of parole. See Exhibit 1, Answer.

On February 25, 2005, a subsequent parole suitability hearing was held by the California Board of Prison Terms ("Board") at Pleasant Valley State Prison. See Exhibit 2, Answer. Petitioner attended the hearing and was represented by his attorney, Linda Buchalter, Esq. Id. At the conclusion of the hearing, the Board denied parole and deferred rehearing for five years. Id. at p. 103.

On June 27, 2005, Petitioner filed a petition for writ of habeas corpus in the Fresno County Superior Court challenging the Board's decision. See Exhibit 4, Answer. The petition was denied on July 8, 2005, with citation to In re Dannenberg, 34 Cal.4th 1061 (2005), In re Van Houten, 116 Cal.App.4th 339 (2004), and In re Rosenkrantz, 29 Cal.4th 616 (2002). See Exhibit 5, Answer. Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeals, Fifth Appellate District, on July 21, 2005. See Exhibit 6, Answer. On August 4, 2005, the petition was summarily denied. See Exhibit 7, Answer. On August 10, 2005, Petitioner filed a petition for review in the California Supreme Court. See Exhibit 8, Answer. The petition was summarily denied on October 12, 2005. See Exhibit 9, Answer.

Petitioner filed the instant petition for writ of habeas corpus on November 28, 2005, in the United States District Court for the Eastern District of California, Sacramento Division. By order of the Court dated April 21, 2006, the petition was transferred to the Fresno Division and received in this Court. The petition for writ of habeas corpus does not challenge the underlying conviction; rather, it challenges the February 25, 2005, decision of the California Board of Prison Terms denying parole. Petitioner claims the Board arbitrarily and unreasonably denied parole without any evidence in violation of his constitutional rights. He further argues that the Board's reliance solely on the circumstances of the commitment offense to deny parole violated his protected liberty interest in parole.

On January 18, 2007, Respondent filed an answer to the petition. Petitioner filed a traverse on February 20, 2007.

**FACTUAL BACKGROUND[2]**

On the evening of June 18, 1980, Petitioner and Michael Morganti burglarized Petitioner's place of employment, which was the office of Dr. Edwards. Michael Morganti was standing in a parking lot on Clovis Avenue when he was contacted by Petitioner. Petitioner asked Morganti if he wanted to help him rob Dr. Edward's office.

Later that evening Petitioner and Morganti drove to the doctor's office, and Morganti was used as a lookout person for anyone who might come by while Petitioner burglarized the doctor's office. Petitioner picked up a large stone and broke out a window in the doctor's office. Petitioner crawled through the window and later returned with a roll of cash. Morganti stated Petitioner drove him to the A&Q Liquor Store and dropped him off. Morganti stated he was extremely mad because Petitioner would not give him any of the stolen money. This burglary took place when Petitioner was a juvenile.

Subsequent to the burglary, Morganti was arrested and made a confession which implicated Petitioner. Dr. Edwards in turn was made aware of this information, and he began to investigate the case of the robbery. They were constantly watching Petitioner under surveillance. Dr. Edwards had numerous confrontations with Petitioner in an attempt to get him to admit that he was responsible for the burglary in his office. Petitioner denied every accusation made by Dr. Edwards.

Then on November 21, 1980, the victim Michael Morganti, who suffered from a mental disability, failed to show up at the independent living program. Morganti's mother became alarmed, and the next day she turned in a missing person's report with the Fresno County Sheriff's Office. The Fresno County Sheriff's Office learned from an anonymous phone call that Morganti had been killed by two young men named John and David. The investigation focused

---

[2]The factual background is derived from the statement of facts read into the record at the February 25, 2005, parole hearing. See Exhibit 2 at pp. 12-21, Answer.

3

on a John Abergas, who was 16 years old at the time of the killing. Abergas was arrested on or about December 17, 1980.

Abergas gave a statement in regards to the facts which led to the death of Morganti. Abergas stated Petitioner contacted him about messing up Morganti before he could testify against him. Abergas stated they had parked between Morganti's apartment complex and the A&Q Liquor Store on Clovis Avenue. They waited approximately one hour for Morganti to exit his apartment complex, from which he did not. Abergas stated they contacted Karen Rasmussen for assistance in trying to lure Morganti from his apartment. After the phone call, Abergas stated he went to Morganti's apartment, and after identifying himself as a Brad Bricker, told Morganti that his sister wanted to meet him by the liquor store. Abergas stated Morganti agreed to accompany him to the liquor store. After going to the liquor store, Abergas stated Petitioner confronted Morganti and told him to get into his pickup truck. When Morganti asked why, Petitioner replied, "Shut up, just get into the truck." Abergas stated they all got into the pickup truck with Morganti sitting in the middle. After driving to a nearby creek, Abergas said they all stepped from the pickup, and Petitioner tied Morganti's hands behind his back with a piece of telephone cable. Abergas stated nothing was really said between the three of them, and Petitioner continued driving. They went through the parking lot of a Stop and Go convenience market twice. Abergas stated that Petitioner explained he did that in case someone was following them. Abergas stated he suggested to Petitioner that they go to the mountains.

After arriving at their destination, Petitioner ordered Morganti from the truck. After getting a shovel and aluminum bat from the vehicle, Petitioner had Morganti walk up a nearby hill. Petitioner untied Morganti's hands and gave Morganti the shovel, and he began digging a hole. When Morganti became tired, Abergas said he took the shovel and continued digging for approximately five minutes. While he was digging, Abergas stated Morganti was sitting nearby while Petitioner was talking to him. Petitioner then gave the bat to Abergas, and he started to dig for approximately 10 minutes. Petitioner then gave the shovel to Morganti and ordered him to continue digging. After digging for a while, Abergas stated Petitioner ordered Morganti to get

into the hole. Morganti complied without hesitation, lying on his back. The hole was too short, so Petitioner ordered Morganti to get up and continue digging at one end. Morganti complied without any hesitation. After several minutes Abergas stated Petitioner again ordered Morganti to stop and again lay down on his back in the hole. Abergas stated Morganti's entire body fit in the hole, and upon seeing him, Petitioner ordered him to sit up with his legs still extended in the hole. Abergas stated Morganti complied, at which time he saw Petitioner swing the bat in the air and come down toward Morganti's head. Abergas stated he turned his head away, and he heard Petitioner hit Morganti four or five times.

Abergas stated he walked away from the immediate area because he didn't want to see Petitioner hit Morganti. During the assault, Abergas said he heard Morganti say, "I won't tell on you, Dave. Stop it. No, Dave." After he was a short distance away, Abergas said Petitioner yelled at him for a knife. Abergas met Petitioner half-way back and gave him a folding Buck knife. As he was walking back up the hill, Abergas said he heard Morganti scream. Moments later Abergas said Petitioner yelled at him to return. Upon his return, Abergas said Petitioner gave him a baseball bat and said, "Hit him." Abergas said Petitioner remarked Morganti was either dead or almost dead, but had to die so that he would not go to jail. Abergas claimed he was scared and complied with Petitioner's request and hit Morganti once on top of the head with the aluminum bat. Abergas said Morganti was lying on his back at the time he struck him. Abergas said he began to leave the scene, but was called back again by Petitioner. Petitioner began shoveling dirt on top of Morganti, and Abergas said he also kicked dirt into the hole on top of Morganti as directed by Petitioner. After completely covering Morganti's body, Abergas said Morganti pushed up through the dirt and grabbed Petitioner's leg. At the same time Abergas said Morganti began to pull his head and upper portion of his body through the dirt. Abergas said that at that point he put his foot on Morganti's head and forced him back down and continued holding him there until Petitioner was able to free himself from Morganti's grasp. Abergas said Petitioner quickly went to his pickup and retrieved the telephone cable that was used to tie Morganti's hands. Abergas stated Petitioner wrapped the cable around Morganti's neck and pulled at both

ends for several seconds. At Petitioner's direction Abergas said he then took one end of the cord, and they pulled on the cable simultaneously. According to Abergas, he allowed the cable to slip from his hands, at which point Petitioner grabbed both ends and continued to strangle Morganti. Abergas said Morganti began kicking his feet, at which Petitioner remarked, "You son of a bitch, die. This son of a bitch won't die." Abergas said he watched until Morganti appeared to have died. Abergas said he struck Morganti on the testicles with the bat to determine if he was still alive, but got no response.

Abergas said Petitioner then pulled Morganti from the grave and continued digging in the hole for another three to five minutes. Abergas indicated he and Petitioner put the victim's body back into the grave and covered him up. Abergas stated at Petitioner's direction, he helped cover the grave with some logs and brush so wild animals would not unearth the body and to make the scene look as natural as possible. Abergas stated that Petitioner was covered in the victim's blood.

After returning to Petitioner's truck, Abergas stated they drove to Petitioner's home and began washing the blood off of himself with a garden hose in the front yard. Petitioner went into his room and took a shower. After Petitioner completed his shower, Abergas said he produced a roll of bills and gave him 50 dollars as agreed.

On December 17, 1980, investigating officers found the burial site and observed a piece of black telephone wires protruding from the ground. Digging around the immediate area, officers found the victim's body, which was face down and fully extended. An autopsy was performed on the morning of December 18, 1980. The body was clothed and covered with dirt. Examination of the victim's head revealed three ragged lacerations. The autopsy report states a black wire has a single knot and circles the neck. During the examination of the victim's respiratory system, Dr. Nelson found that the air passage contained brown dirt of which was in clumps, and some of which was mixed with a little mucia. The cause of death was suffocation.

///

///

**DISCUSSION**

I.      Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

1  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
2  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this
3  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
4  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
5  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
6  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

7        Finally, this Court must consider whether the state court's decision was "contrary to, or
8  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
9  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
10 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
11 Court on a question of law or if the state court decides a case differently than [the] Court has on a
12 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.
13 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
14 state court identifies the correct governing legal principle from [the] Court's decisions but
15 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at
16 413.

17       "[A] federal court may not issue the writ simply because the court concludes in its
18 independent judgment that the relevant state court decision applied clearly established federal
19 law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.
20 A federal habeas court making the "unreasonable application" inquiry should ask whether the
21 state court's application of clearly established federal law was "objectively unreasonable." Id. at
22 409.

23       Petitioner has the burden of establishing that the decision of the state court is contrary to
24 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
25 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
26 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
27 state court decision is objectively unreasonable.  See Clark v. Murphy, 331 F.3d 1062, 1069 (9th

28

1  Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

2  AEDPA requires that we give considerable deference to state court decisions. The state
3  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's
4  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,
5  537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

6  II.    Review of Claims

7  A parole release determination is not subject to all of the due process protections of an
8  adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see
9  also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979)
10 (explaining that due process is flexible and calls for procedural protections that particular
11 situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution,
12 the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated,
13 even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of
14 Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process
15 to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing,
16 Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard,"
17 Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied parole, the inmate must be told why
18 "he falls short of qualifying for parole." Id.

19 "In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court further held that
20 'revocation of good time does not comport with 'the minimum requirements of procedural due
21 process,' unless the findings of the prison disciplinary board are supported by *some evidence* in
22 the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)."
23 Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (emphasis added).
24 Although Hill involved the accumulation of good time credits, the same standard applies to
25 parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v.
26 Oregon Bd. of Parole, 833 F.2d at 1390; McQuillion v. Duncan, 306 F.3d 895, 904 (9th
27 Cir.2002), *citing* Superintendent v. Hill, 472 U.S. at 456; Powell v. Gomez, 33 F.3d 39, 40 (9th
28

Cir.1994), *citing* Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir.1992). "The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the factfinder. Powell, 33 F.3d at 40, *citing* Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987); Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir.1986). However, "the evidence underlying the board's decision must have some indicia of reliability." Jancsek, 833 F.2d at 1390; see also Perveler, 974 F.2d at 1134. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Sass, 461 F.3d at 1128, Toussaint, 801 F.2d at 1105..

With regard to the procedural protections outlined in Greenholtz, as the parties agree, Petitioner was provided all that is required. Petitioner was provided with advance notice of the hearing, an opportunity to submit materials for the Board's consideration, an opportunity to be heard during the hearing, representation by his attorney, and a written decision explaining the reasons that parole was denied. Petitioner, however, contends the Board's decision was not supported by the evidence.

In denying parole, the Board found Petitioner was not suitable because he posed "an unreasonable risk of danger to society or a threat to public safety if released from prison." See Exhibit 2 at p. 102, Answer. Pursuant to 15 C.C.R. § 2402(c)(1)[3], the Board concluded that the especially heinous, atrocious, and cruel manner in which Petitioner committed the offense indicated unsuitability. In particular, the Board noted that the offense was carried out in a

---

[3]Pursuant to Title 15, of the California Code of Regulations, Section 2402(c)(1) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 (C) The victim was abused, defiled or mutilated during or after the offense.
 (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
 (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

dispassionate and calculated manner, such as an execution-style manner. 15 C.C.R. § 2402(c)(1)(B). This finding is well-supported by the evidence. There is evidence that Petitioner planned the murder. Petitioner forced the victim, a mentally-disabled individual, to dig his own grave. Petitioner beat the victim with a baseball bat, stabbed the victim, and then suffocated him.

Pursuant to § 2402(c)(1)(C), the Board found the victim was abused, defiled, or mutilated. This finding is also supported by the facts. Again, Petitioner forced the victim to dig his own grave. He beat the victim severely with a baseball bat. After beating the victim, Petitioner then stabbed him repeatedly with a folding Buck knife. Petitioner then buried the victim while he struggled. Finally, Petitioner pulled the victim out of the grave and strangled him with a telephone cord until he expired.

Pursuant to § 2402(c)(1)(D), the Board determined the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. This finding is well-supported by the facts as set forth above.

Pursuant to § 2402(c)(1)(E), the Board further found the motive for the crime was inexplicable or very trivial in relation to the offense. As stated in the factual summary, Petitioner's motive was to prevent the victim from testifying that Petitioner was involved in the burglary of his employer's place of business. Clearly, the motive for the crime is most trivial in relation to the heinous offense. Thus, the state court reasonably found the Board's finding that the offense was carried out in an especially atrocious and heinous manner was supported by some evidence.

The Board also denied rehearing for a period of five years. See Exhibit 2 at p. 103, Answer. As the basis for this decision, the Board again relied on the circumstances of the commitment offense as discussed above. In addition, the Board noted Petitioner had an unstable social history per § 2402(c)(3). As support for this finding, the Board noted Petitioner was a high school drop-out who had a history of drug use involving marijuana, alcohol, and LSD. This finding is also supported by some evidence. Petitioner admitted to having used the afore-mentioned drugs recreationally.

11

1    The Board further noted that Petitioner had a prior history of criminality. While this is
2 not an enumerated factor demonstrating unsuitability, pursuant to § 2402(b), the Board may
3 consider Petitioner's "past criminal history, including involvement in other criminal misconduct
4 which is reliably documented." Although he wasn't convicted of the crime, Petitioner admitted to
5 having committed the burglary which gave rise to the instant offense. Thus, this finding is
6 supported by some evidence.

7    The Board next found that Petitioner had not sufficiently participated in self-help
8 programming. See Exhibit 2 at p. 105, Answer. While this too is not an enumerated factor
9 demonstrating unsuitability, pursuant to § 2402(b), the Board may consider Petitioner's past and
10 present mental state, and his conditions of treatment or control. The Board did state that
11 Petitioner had participated in self-help programming; however, in light of the length of time
12 Petitioner had been incarcerated, his participation was limited. Further, the Board noted that a
13 prognosis from a psychological report completed in February 10, 2000, was not totally supportive
14 of release ("guardedly positive"). See Exhibit 2 at 105, Answer. Petitioner argues that a newer
15 report had been completed in 2005 by a psychologist retained by Petitioner, and this psychologist
16 was totally supportive of release. Nevertheless, the Board stated it had considered said report.
17 Because there is some evidence supporting the Board's determination, the state court rejection of
18 Petitioner's claim was not unreasonable.

19    The Board also found Petitioner did not have viable residential plans or employment
20 plans in the county of last legal residence. This finding is not supported by some evidence
21 because Petitioner provided the Board with numerous offers of employment assistance, monetary
22 assistance, housing, and actual job offers. Thus, the state court rejection of this claim was
23 objectively unreasonable.

24    The Board further noted that the Fresno County District Attorney and the victim's next of
25 kin had appeared at the hearing and vehemently opposed a finding of suitability. Pursuant to
26 § 2402(b), this was relevant, reliable information which could be considered.

27    Finally, the Board found Petitioner needed further therapy to cope with stress and develop
28

appropriate insight into why he committed the offense. Pursuant to § 2402(b), the Board may consider Petitioner's past and present mental state, and his past and present attitude toward the crime. The psychological reports found Petitioner was not in need of further therapy and had developed insight into his offense. However, the Board stated it was not in full agreement with these reports. There is some evidence to support this determination. In relating the facts of the crime to Dr. Melvin Macomber in 2005, Petitioner minimized his participation in the crime and placed the blame for his actions almost entirely on Abergas. He made the following statements:

> By the time we came to a clearing, John [Abergas] had already been brandishing his knife and hitting Michael with the baseball bat. I remember asking myself 'what we are [sic] doing here and where is this going!' The rage I saw in John toward Michael didn't make sense to me. In response, I asked John to stop hitting him . . . .
>
> John became frustrated when it appeared Michael was obviously not making any real effort to dig, and began striking Michael with the bat again. I remember wanting this to end at this point and told John to stop. . . .
>
> After Michael had sat up again, John pushed Michael's face back into the dirt with his foot and held it there. Michael died of suffocation.

See Exhibit E, Petition.

Petitioner's description of the offense is completely different from the account which Abergas provided and which was found to be true by the jury. In addition, it is contradicted by the evidence. The victim did not die of suffocation as a result of Abergas pushing his face into the dirt with his foot; he died of suffocation as a result of Petitioner strangling him with a telephone cord as noted in the autopsy. In addition, Petitioner conveniently leaves out the part where he stabbed the victim repeatedly with the folding buck knife. It is understandable why the Board found Petitioner's past and present attitude toward the crime pointed toward unsuitability.

The Board also considered factors tending to show suitability. Although Petitioner had received five "CDC 115" disciplinary chronos and five "CDC 128A" counseling chronos, the last CDC 115 was in 1986. Thus, Petitioner had remained disciplinary free since 1986. The Board further noted that Petitioner had received vocational training and had completed several self-help programs. Nevertheless, the BPH found these positive factors, while promising for a possible future grant of parole, did not outweigh the Board's determination that Petitioner remained an

unreasonable risk of danger to society if released.

Petitioner further argues he is being denied parole solely on the basis of the immutable factors of his commitment offense. In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir.2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Although a denial of parole initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Irons v. Carey, ___ F.3d ___, 2007 WL 2027359 *5 (9th Cir. 2007), *citing* Biggs, 334 F.3d at 916. Nevertheless, in both Irons and Biggs, the Ninth Circuit upheld the denials of parole based solely on the commitment offense. This was because in each of these cases the prisoner had not yet served the minimum term of his sentence.

The instant case does not give rise to the same concerns discussed in Iron and Biggs. Although Petitioner has been denied parole primarily on the circumstances of the crime itself, there were other factors discussed above that also pointed to unsuitability. These other factors when viewed alongside the circumstances of the offense amount to some evidence to support the Board's conclusion that Petitioner poses an unreasonable risk of danger to the public if released. The state court rejection of Petitioner's claims was not unreasonable.

**RECOMMENDATION**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.   The petition for writ of habeas corpus be DENIED; and

2.   The Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    October 4, 2007**                    /s/ Sandra M. Snyder
                                                              UNITED STATES MAGISTRATE JUDGE